The court incorporates by reference in this paragraph and adopts as the findings and analysis of this court the document set forth below. This document has been entered electronically in the record of the United States Bankruptcy Court for the Northern District of Ohio.



Dated: May 20 2015

John P. Gustafson
United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| In Re: | ) | Case No: 13-31772 |
| | ) | |
| Jennifer L. Alwood and | ) | Chapter 7 |
| James D. Pinkerman, | ) | |
| | ) | Adv. Pro. No. 14-3009 |
| Debtors. | ) | |
| | ) | Judge John P. Gustafson |
| James A. Meade, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | |
| James D. Pinkerman, | ) | |
| | ) | |
| Defendant. | ) | |

**<u>MEMORANDUM OF DECISION</u>**

     This cause comes before the court after trial on Plaintiff's amended complaint to determine dischargeability of a debt allegedly owed to him by Defendant, one of the debtors in the underlying Chapter 7 case. Plaintiff alleges that the debt should be excepted from discharge under 11 U.S.C. §523(a)(2)(A) and (a)(4). Plaintiff and Plaintiff's Counsel appeared at the trial in person, where they had the opportunity to call a witness and present their arguments and evidence to the court. There was no appearance by or on behalf of Defendant, who now represents himself pro se, pursuant to the court's order granting Attorney Brian W. Benbow's Motion to Withdraw as Attorney for Defendant on November 18, 2014. [Doc. # 36].

     The district court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §1334(b) as

a civil proceeding arising in or related to a case under Title 11. This proceeding has been referred to this court by the district court under its general order of reference. 28 U.S.C. §157(a); General Order 2012-7 of the United States District Court for the Northern District of Ohio. Proceedings to determine dischargeability of debts are core proceedings that the court may hear and decide. 28 U.S.C. §157(b)(1) and (b)(2)(I).

In reaching these conclusions, the court has considered all the evidence and arguments of counsel, regardless of whether or not they are specifically referred to in this opinion. Based upon that review, and for the reasons discussed below, the court finds that Plaintiff is entitled to judgment on his §§523(a)(2)(A) and 523(a)(4) claims.

## FINDINGS OF FACT

In June 1996, Plaintiff incorporated Meade Enterprises, Inc. ("MEI"). [Pl. Ex. 1]. He testified that the purpose of the corporation was to utilize the corporate structure for taxes and security while he was working for the Justice Department in Europe. Plaintiff and Barbara Meade ("Plaintiff's wife") signed the Articles of Incorporation and were the only two incorporators to sign the document. [*Id.*]. At all times relevant to this case, Plaintiff's wife was a shareholder, director, President and CEO of MEI. [Doc. # 4, ¶ 10]. In April 2010, MEI certified with the Secretary of State that it was doing business as "Ultimate Floors by Rhino". [Pl. Ex. 2]. Plaintiff testified that over the course of the next year, the business grew, and Plaintiff had to look for more operating equipment in order for Ultimate Floors by Rhino to meet the demand.

In May 2012, Plaintiff was introduced to Defendant. As stated in the Amended Complaint, Defendant "held himself out to be a business owner and a managing partner of JennDa LLC and several other business entities." [Doc. # 4, ¶ 11]. Defendant promised to work with Plaintiff in an effort to find investors for Plaintiff's company.

Plaintiff stated on the record at trial that Defendant did not inform him that he had previously worked as a CPA and in 2005 had plead guilty to felony charges of theft and forgery. [Pl. Ex. 25]. Defendant did not inform Plaintiff that JennDa LLC was not and is not a registered LLC in the state of Ohio. [Pl. Ex. 8]. Additionally, Defendant did not inform Plaintiff that he was also the agent of several other business entities. Those entities are Triple D Solutions, LLC ("Triple D") [Pl. Ex. 3], Advanced Direct Marketing, Inc. [Pl. Ex. 4], and Heritage Property Investments LLC. [Pl. Ex. 7].

In November 2012, Plaintiff had grown tired of working with Defendant. Defendant had yet to secure "appropriate financing or investors," and Plaintiff decided to terminate his business dealings with

Defendant. [Doc. # 4, ¶ 13]. That same month, Plaintiff's wife was in contact with Defendant, as evidenced by emails provided to the court. The emails involved a conversation between Plaintiff's wife and Defendant detailing a process by which Plaintiff (who was not privy to the emails) and Plaintiff's wife would dilute MEI and give 17% of each of their shares to their son, A.J. Meade (or "Andrew Meade" or "Plaintiff's son"). [Pl. Ex. 12].

Plaintiff was unaware that Defendant had been included in any discussions regarding Plaintiff and Plaintiff's wife dividing MEI into thirds. Plaintiff testified that he was unaware that Defendant was involved in the eventual drafting of a "Resolution of the Board/Stock Issuance Resolution and Appointment of Director" ("Resolution"). He also testified that if he had known that Defendant was behind the transaction, he never would have agreed to the terms of the Resolution. As it was, Defendant hid his involvement from Plaintiff.

Plaintiff testified that he signed the Resolution when his wife presented it to him. The Resolution diluted Plaintiff's MEI shares and gave a third of the company to A.J. Meade. [Pl. Ex. 16], resulting in Plaintiff, Plaintiff's wife, and A.J. Meade each owning a third of the company.

Shortly after the Resolution was signed, Plaintiff's wife, Plaintiff's son, and Defendant met and signed an "Agreement for Purchase and Sale of Business" (the "Agreement") for the operations being conducted under the name Ultimate Floors by Rhino. [Pl. Ex. 17]. As a result of the Agreement, Ultimate Floors by Rhino was sold to Triple D Solutions, LLC. The Agreement was signed by Barbara Meade, A.J. Meade, and Defendant. Plaintiff never signed the document, and was initially unaware of its existence.

Part of the Agreement stated that $12,000 cash was to be paid by Triple D when the Agreement was signed. [*Id.*] Neither Barbara Meade, A.J. Meade, nor Defendant have provided any evidence that Defendant or Triple D paid the agreed upon $12,000 cash, although Plaintiff testified that his "wife admitted [that] she received $4,000." Additional terms of the Agreement stated that an $8,000 note would be due upon signing, a promissory note would be executed in favor of MEI by Triple D for $205,000, to be payable in monthly installments of $4,000, and a 20% equity ownership of Triple D would be given to MEI. [*Id.*]. Defendant later admitted in a deposition that he has "about [an] 80%" ownership interest in Triple D. [Pl. Ex. 24, at p. 34]. Plaintiff did not discover any of the information regarding Defendant's past criminal convictions and involvement in the other business entities until after his wife and son entered into the Agreement with Defendant. [Doc. # 1, ¶ 22].

After the Agreement was signed, Plaintiff testified that Defendant arranged for another entity, Advanced Direct Marketing, LLC ("Advanced Direct") to operate and manage Ultimate Floors by Rhino.

3

In December of 2012, Plaintiff's wife received a check from "Advanced Direct Marketing Inc. dba Ultimate Floors" [Pl. Ex. 20], even though, as Plaintiff testified at trial, Advanced Direct was never given permission to do business as Ultimate Floors.

Defendant failed to transfer the licensing agreement with Rhino Linings from MEI. Nevertheless, he began to utilize the Rhino Linings trademark. Defendant signed numerous checks from Advanced Direct, made out to Barbara Meade and Andrew Meade, which contained the Rhino Linings logo in the upper lefthand corner of each check. [Pl. Ex. 23]. In February 2013, Defendant, through Advanced Direct, placed an order with Rhino Linings Corporation, to be billed to Ultimate Floors by Rhino. [Pl. Ex. 22]. As of the date of the trial, the balance of Defendant's order had yet to be paid. [Pl. Ex. 22-A].

Starting in the Spring of 2012, Plaintiff testified that his business was "failing. . . right down to the end." In 2013, Plaintiff was contacted by Red Sun Media. A $600 charge had appeared on his debit card, which Red Sun Media kept on file. Upon contacting Red Sun Media, Plaintiff learned from a woman working for Red Sun that "she had contacted him" and he had approved the charge, even though Plaintiff testified that he had never spoken to the woman before. The caller that had initially contacted Red Sun and placed the order had misidentified himself as Plaintiff and informed the woman to pay for the order with the card on file. To the best of Plaintiff's knowledge, Defendant had placed the phone call and identified himself falsely as Plaintiff, in order to place the order on Plaintiff's debit card.

Although the charge with Red Sun Media was reversed, over the course of roughly two years, from the time Plaintiff signed the Resolution to the date of the trial, Defendant incurred approximately $30,000 of debt, in addition to the unpaid balance of over $5,000 that Defendant incurred in connection with an order from Rhino Linings. [*Id.*]. MEI's federal tax returns, from 2011 through 2013, showed that total income decreased from a 2011 high of $202,531 to a 2013 low of $13,313. [Pl. Exs. 26-28].

With regards to Ultimate Floors by Rhino, Plaintiff stated that he still is able to do some consulting work, but that Defendant "[installed] enough floors to harm [my] reputation."

On February 5, 2013, Plaintiff filed suit against Defendant in the Licking County Court of Common Pleas, in case number 2013 CV 00127. That action was stayed, as on April 27, 2013, Defendant filed the underlying Chapter 7 case. The court notes that Defendant's Schedule B did not list any of his interests in any of the aforementioned business entities.

4

## LAW AND ANALYSIS

**I. 11 U.S.C. §523(a)(2)(A)**

Plaintiff seeks a determination that any debt owed to him by Defendant in connection with the events leading up to and following the execution of the Resolution is nondischargeable under 11 U.S.C. §§523(a)(2)(A) and 523(a)(4). Exceptions to discharge are to be strictly construed against the creditor and liberally in favor of the debtor. *Rembert v. AT&T Universal Card Servs. (In re Rembert),* 141 F.3d 277, 281 (6th Cir. 1998); *In re Livingston,* 372 F. App'x 613, 618 (6th Cir. 2010).

Section 523(a)(2)(A) excepts from discharge a debt "for money, property, [or] services,... to the extent obtained by – (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition. . . ." In order to except a debt from discharge under this section due to false pretense, false representation, or actual fraud, a plaintiff must prove the following elements by a preponderance of the evidence: (1) the debtor obtained money, property, services or credit through a material misrepresentation, either express or implied, that, at the time, the debtor knew was false or made with gross recklessness as to its truth; (2) the debtor intended to deceive the creditor; (3) the creditor justifiably relied on the false representation; and (4) the creditor's reliance was the proximate cause of loss. *Rembert,* 141 F.3d at 280-81.

For purposes of §523(a)(2)(A), "false representations and false pretenses encompass statements that falsely purport to depict current or past facts." *Peoples Sec. Fin. Co., Inc. v. Todd (In re Todd)*, 34 B.R. 633, 635 (Bankr. W.D. Ky. 1983). In analyzing "actual fraud," the *McClellan* court found that §523(a)(2)(A) was not limited to fraudulent misrepresentation. "[B]y distinguishing between 'a false representation' and 'actual fraud,' the statute makes clear that actual fraud is broader than misrepresentation." *McClellan v. Cantrell*, 217 F.3d 890, 893 (7th Cir. 2000). *McClellan* acknowledges that numerous cases have assumed "that 'actual fraud' involves a misrepresentation." *Id.* But, a restricted definition such as this is not required, because actual fraud encompasses "any deceit, artifice, trick, or design involving direct and active operation of the mind, used to circumvent and cheat another." *Id.* (*citing,* 4 Lawrence P. King, Collier on Bankruptcy ¶ 523.08[1][e], at 523-45 (15th ed. Rev. 2000)). The *McClellan* court continued:

> Fraud is a generic term, which embraces all the multifarious means which human ingenuity can devise and which are resorted to by one individual to gain an advantage over another by false suggestions or by the suppression of truth. No definite and invariable rule can be laid down as a general proposition defining fraud, and it includes all surprise, trick, cunning, dissembling, and any unfair way by which another is cheated."

*Id.* (*quoting, Stapleton v. Holt*, 207 Okla. 443, 250 P.2d 451, 453-54 (1952)).

5

> Actual fraud has been defined as intentional fraud, consisting in deception intentionally practiced to induce another to part with property or to surrender some legal right, and which accomplishes the end designed. It requires intent to deceive or defraud.

*Gerad v. Cole (In re Cole)*, 164 B.R. 951, 953 (Bankr. N.D. Ohio 1993)(*quoting*, *United States v. Lichota*, 351 F.2d 81, 90 (6th Cir. 1965)).

In *Vitanovich*, the Sixth Circuit Bankruptcy Appellate Panel adopted the Court of Appeals for the Seventh Circuit's position in *McClellan,* 217. F.3d at 893, that actual fraud as used in the statute is not limited to misleading omissions and misrepresentations. "When a debtor intentionally engages in a scheme to deprive or cheat another of property or a legal right, that debtor has engaged in actual fraud and is not entitled to the fresh start provided by the Bankruptcy Code." *Mellon Bank, N.A. v. Vitanovich (In re Vitanovich)*, 259 B.R. 873, 877 (6th Cir. BAP 2001).

This is consistent with the *Rembert* decision, which held that a debtor's intent to defraud a creditor is measured by a subjective standard and must be ascertained by the totality of the circumstances of the case at hand. *Rembert,* 141 F.3d at 281-82. A finding of fraudulent intent may be made on the basis of circumstantial evidence or from the debtor's "course of conduct," as direct proof of intent will rarely be available. *Hamo v. Wilson (In re Hamo),* 233 B.R. 718, 724 (B.A.P. 6th Cir. 1999). However, "if there is room for an inference of honest intent, the question of nondischargeability must be resolved in favor of the debtor." *ITT Final Servs. v. Szczepanski (In re Szczepanski),* 139 B.R. 842, 844 (Bankr. N.D. Ohio 1991).

With respect to his actual fraud claim under §523(a)(2)(A), the court finds that Plaintiff has proven that Defendant committed actual fraud by intentionally engaging in a scheme that was intended to deprive Plaintiff of his business. Pursuant to the *McClellan, Cole,* and *Vitanovich* decisions, Defendant committed actual fraud when he deceitfully and intentionally induced Plaintiff into issuing stock in MEI to Defendant's son. He intentionally created the plan of action with Plaintiff's wife and son, whereby they gained a majority interest in MEI and could sell Ultimate Floors to Defendant without Plaintiff's approval. In executing the scheme, Defendant was able to purchase (through one of his LLCs) Ultimate Floors by Rhino. Subsequently, upon gaining control of Ultimate Floors by Rhino, Defendant improperly utilized the Rhino Linings trademark, thereby breaching the terms of Rhino Linings' licensing agreement with MEI, which had never been transferred to Defendant in the sale of Ultimate Floors by Rhino. Defendant also ran the business into the ground, not just through mismanagement, but also through improper self-dealing.

6

## II. 11 U.S.C. §523(a)(4)

Plaintiff also seeks a determination that a debt owed to him by Defendant in connection with the events leading up to and following the transfer of the shares of MEI is nondischargeable under 11 U.S.C. §523(a)(4), which provides as follows:

> a) A discharge under section 727 . . . of this title does not discharge an individual from any debt –
>
> . . . .
>
> (4) for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny.

11 U.S.C. §523(a)(4). A §523(a)(4) claim must be proven by a preponderance of the evidence. *R.E. America, Inc. v. Garver (In re Garver)*, 116 F.3d 176, 178 (6th Cir. 1997). In the Sixth Circuit, the defalcation provision is limited to situations involving an express or technical trust relationship that arises from the placement of a specific res in the hands of the debtor. *Commonwealth Land Title Co. V. Blaszak (In re Blaszak)*, 397 F.3d 386, 391 (6th Cir. 2005); *In re Bucci*, 493 F.3d 635 (6th Cir 2007). Fraud or defalcation requires a culpable state of mind such "as one involving knowledge of, or gross recklessness in respect to, the improper nature of the relevant fiduciary behavior." *Bullock v. BankChampaign, N.A.*, 133 S. Ct. 1754, 1757, 185 L.Ed.2d 922 (2013).

The facts in this case do not present a situation where Defendant was proven to have acted in a fiduciary capacity, so the court must examine the §523(a)(4) claim though the lense of embezzlement or larceny. Here, the court finds that Defendant did not engage in "embezzlement" as that term is used in the Bankruptcy Code. Under the embezzlement provision of §523(a)(4), there is no requirement to prove fiduciary capacity. *See, Peavey Electronics Corp. v. Sinchak (In re Sinchak)*, 109 B.R. 273, 276 (Bankr. N.D. Ohio 1990) (stating the element of "fiduciary capacity" in §523(a)(4) refers only to "fraud or defalcations" and need not be present where embezzlement is the exception relied upon). The Sixth Circuit defines embezzlement for purposes of §523(a)(4) as "the fraudulent appropriation of property by a person to whom such property has been entrusted or into whose hands it has lawfully come." *Brady v. McAllister (In re Brady)*, 101 F.3d 1165, 1172-73 (6th Cir. 1996); *see also, In re Fox*, 370 B.R. 104, 115-16 (B.A.P. 6th Cir. 2007). A creditor proves embezzlement by establishing that (1) he entrusted his property to the debtor or debtor lawfully obtained the property, (2) the debtor appropriated the property for a use other than that for which it was intended, and (3) the circumstances indicate fraud. *Id.* at 1173.

Plaintiff cannot succeed on a §523(a)(4) claim sounding in embezzlement, as he cannot meet the first requirement for embezzlement as set forth by the *Brady* court. Based upon this court's analysis of Plaintiff's

§523(a)(2) claim and its finding that Defendant committed actual fraud in gaining control of Ultimate Floors by Rhino, the court cannot also find that Plaintiff entrusted his property to Defendant or that Defendant acquired it lawfully. However, Plaintiff can succeed on one of his claims under the "larceny" provision.

For purposes of §523(a)(4), larceny is defined as "the fraudulent and wrongful taking and carrying away of the property of another with intent to convert such property to the taker's use without the consent of the owner." *Graffice v. Grim (In re Grim)*, 293 B.R. 156, 165-66 (Bankr. N.D. Ohio 2003)(*citing*, *Schreibman v. Zanetti-Gierke (In re Zanetti-Gierke)*, 212 B.R. 375, 381 (Bankr. D. Kan. 1997)). In a nondischargeability context, intangible property is included within the scope of the statute, and a creditor can be deprived of his use of intellectual property just as easily as tangible personal property. *See generally*, *Monsanto Co. V. Trantham (In re Trantham)*, 304 B.R. 298 (6th Cir. B.A.P. 2004).

Pursuant to the Rhino Linings Corporation Rhino Home Pro Agreement ("Rhino Linings Agreement"), MEI dba Ultimate Floors by Rhino could utilize the Rhino Linings trademarks. [Doc. # 4-5, Article 1]. However, the Rhino Linings Agreement could not be transferred or sold to another party unless a specific procedure was followed. This procedure requires the Dealer (in this case, MEI dba Ultimate Floors by Rhino) to provide written notice to Rhino Linings of the Dealer's intent to transfer the Rhino Lings Agreement. A transfer fee must also be paid to Rhino Linings, and Rhino Linings must approve the transfer. [Doc. #4-5, Article 7].

The evidence and testimony provided to the court shows that this procedure was not complied with by Defendant after he fraudulently acquired Ultimate Floors by Rhino. Although he made no attempt to transfer the Rhino Linings Agreement to himself, Defendant wrongfully and intentionally utilized the Rhino Linings trademark, converting the property to his own use, without obtaining the consent of the authorized user. In furtherance of the larceny, Defendant, fraudulently acting as Ultimate Floors, made several purchases from Rhino Linings [Doc. # 22], the balance of which has yet to be paid. Defendant made these purchases, even though he never satisfied the terms of sale of Ultimate Floors from MEI to himself. At the trial, Plaintiff submitted evidence to the court that as of October 6, 2014, a balance of $5,521.34 is still owed to Rhino Linings, as a result of Defendant's purchases. When Plaintiff entered into the Rhino Linings Agreement, he signed a personal guarantee, which "unconditionally and irrevocably" guaranteed the prompt payment to Rhino Linings for any purchases made under the Rhino Linings Agreement. [Doc. # 4-5, Appendix F].

With respect to Plaintiff's claim under 11 U.S.C. §523(a)(4), the court finds that the debt of $5,521.34, and any additional financing charges that have arisen since the October 6, 2014 Rhino Linings

statement, is hereby excepted from Defendant's discharge.

## III. Civil Conspiracy

Because the court has ruled under 11 U.S.C. §523(a)(2)(A) and §523(a)(4) that the debts arising from Defendant's actual fraud and larceny are excepted from Defendant's discharge, the court need not address Plaintiff's final claim under civil conspiracy.

## CONCLUSION

Plaintiff, through his pleadings, averments, testimony, and evidence presented at trial, has proven that Defendant committed actual fraud under §523(a)(2)(A) and larceny under §523(a)(4). Therefore, Plaintiff is entitled to judgment in his favor on his claims under the aforementioned statutes. With regards to the loss of income of Plaintiff's business, the court does not find it necessary or appropriate in this adversary proceeding to enter a separate or additional federal money judgment on the Amended Complaint. Rather, the court will enter its judgment finding that any state court judgment that may be entered in the Licking County Court of Common Pleas in Case No. 2013 CV 00127, shall be excepted from Defendant's discharge. The Supreme Court held in *Cohen v. De La Cruz*, 523 U.S. 213 (1998), that any liability that arose from the underlying debtor misconduct was nondischargeable, including in that action under §523(a)(2) for actual damages, treble damages, punitive damages, attorney's fees and court costs. And so it is in this proceeding, that the amounts the state court determines to be owed to Plaintiff by Defendant are excepted from Defendant's Chapter 7 bankruptcy discharge

Additionally, the current balance of $5,521.34 owed to Rhino Linings as a result of Defendant's purchases, along with any additional financing charges that have arisen since the October 6, 2014 Rhino Linings statement, are hereby excepted from Defendant's discharge.

The court will enter a separate judgment in accordance with this Memorandum of Decision and its rulings at trial under Federal Rule of Bankruptcy Procedure 7052 and Federal Rule of Civil Procedure 52(c).

###